JAMI M. HOSKINS and MICHAEL HOSKINS,    )
                                               )
       Plaintiffs,                      )
                                               )
       v.                                )   Case No.: 4:07-CV-72 JD
                                                 )
GUNN TRUCKING and CLAUDE R. GUNN,     )
                                               )
       Defendants.                   )

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is the Motion to Bar [DE 56] filed by Defendants Gunn Trucking and

Claude R. Gunn, to which Plaintiffs Jami and Michael Hoskins responded [DE 60], and

Defendants replied [DE 61]. For the reasons discussed below, Defendants' Motion to Bar is

DENIED.

## I. BACKGROUND

This is Defendants' third attempt to bar the testimony of Plaintiffs' Rule 26 expert, Dr.

Tonia Wolf Kusumi. On April 24, 2009, instead of striking Dr. Kusumi's testimony as requested

by Defendants, the Court allowed Plaintiffs to file an amended expert report in order to comply

with Rule 26(a)(2) and include a separate written report disclosing Dr. Kusumi's opinions and

the basis for them [DE 40]. On September 14, 2009, the Court rejected Defendants' assertion

that Dr. Kusumi's amended report failed to comply with Rule 26(a)(2)(B), because counsel

drafted the same [DE 51]. Having recently deposed Dr. Kusumi, Defendants now argue that

pursuant to Rule 702, Dr. Kusumi is unqualified to provide any opinions regarding the causation,

prognosis, and permanency of the injuries that Jami Hoskins sustained in the December 4, 2005

automobile accident at issue in this case ("the December 2005 accident"). Defendants assert that

Ms. Hoskins' treating physicians and medical records reveal that her injures were caused by a 2002 tubing accident and a May 2005 automobile accident, which contradict Dr. Kusumi's allegedly unreliable opinion that Ms. Hoskins suffered injury proximately caused by the December 2005 accident [DE 56 at 2-3]. The facts relevant to the Motion to Bar Dr. Kusumi's testimony, as set forth below, are considered for purposes of determining whether Dr. Kusumi's opinion is admissible under Rule 702.

## II. FACTS

### 2002 Tubing Accident

In late 2002, Jami Hoskins was involved in an accident during which she fell off an inflatable tube being towed behind a motorboat [DE 56-2, Hoskins Dep. pt. 1, p. 18]. As a result of the tubing accident, in January 2003 Ms. Hoskins sought regular treatment for chronic back pain from a lead physician at the Advanced Pain Management Clinic (or Pain Care Center), Dr. Ramos[1] [Hoskins Dep. pt. 1, p. 9; DE 56-4, Ramos Dep., p. 2-3]. Ms. Hoskins testified that the pain she suffered was not in her lower back, *see* [Hoskins Dep. pt. 1, p. 9, 18]; however, Dr. Ramos recalled treating Ms. Hoskins over the course of time for low, mid, and upper back problems relative to this accident [Ramos Dep., p. 2, 7]. Ms. Hoskins described her back pain as stabbing, shooting, aching, and burning [Ramos Dep., p. 3]. Thus, from 2003 through 2005, Dr. Ramos attempted to control her "chronic" pain by prescribing her strong pain medications, such as Hydrocodone and Methadone. *Id*. at 3-4, 6, 9. Dr. Ramos testified that he advised Ms. Hoskins to exercise, lose weight, and she see a psychiatrist or psychologist for support with

---

[1]Dr. Ramos has practiced anesthesia since he finished his residency at Cook County in 1990, and has specialized in pain medicine for approximately nine years [Ramos Dep., p. 1]. Dr. Ramos is board certified in anesthesia, pain medicine, and pain management. *Id*.

depression that typically results from chronic pain. *Id*. at 6-7. As late as March 2005, Dr. Ramos reported that Ms. Hoskins had an overall pain score of four (out of ten), but her stabbing and burning pain persisted and still ranked at a ten [Ramos Dep., p. 5]. As a result, Ms. Hoskins remained on Hydrocodone and Methadone [Hoskins Dep. pt. 1, p. 8-9; Ramos Dep., p. 5-6].

In July 2004, Dr. Hafeez[2] became Ms. Hoskins primary family care physician responsible for treating her general health issues and referring her to a specialist when needed for a specific condition [Hoskins Dep. pt. 1, p. 1; DE 56-5, Hafeez Dep., p. 2, 4]. Ms. Hoskins' previous primary care doctor prescribed her Zoloft, so Dr. Hafeez continued the prescription on account of Ms. Hoskins' diagnosed depression and anxiety [Hafeez Dep., p. 5]. Dr. Hafeez normally referred his patients to Dr. Ramos for pain management, but he did not do so for Ms. Hoskins because she was already seeing Dr. Ramos for her chronic pain. *Id*. at 4-5. Further, Dr. Hafeez conceded that Dr. Ramos was more qualified to testify about Ms. Hoskins' specific complaints and conditions of pain and injury, and thus, he deferred to Dr. Ramos to provide testimony regarding the same. *Id*. at 5.

May 2005 Automobile Accident

On May 12, 2005, Ms. Hoskins was again involved in an accident—this time an automobile accident which caused her vehicle to roll over ("the May 2005 accident") [Hoskins Dep. pt. 1, p. 11]. Ms. Hoskins was taken to the Emergency Room at St. Vincent Williamsport Hospital, where she complained of pain in her lower back and lower legs, as well as leg numbness [DE 56-7, Kusumi Rpt., p. 2]. The day after the accident, Ms. Hoskins underwent

_____

[2]Dr. Hafeez is an Internist and has practiced internal medicine since July 1995 [DE 56-5, Hafeez Dep., p. 2]. His practice is located in Veedersburg, Indiana at the South Clinic of St. Vincent Hospital. *Id*.

major surgery for what she characterized as a "broken" back (or a T-12 "burst fracture") [Hoskins Dep. pt. 1, p. 5, 11; Ramos Dep., p. 8]. The surgery to correct the decompression of her spinal cord and to repair her fractured vertebra was performed by Dr. Mobasser, a neurosurgeon for Indiana Neurosurgical Group [Hoskins Dep. pt. 1, p. 6, 11; Kusumi Rpt., p. 2]. Unfortunately, the surgery caused permanent nerve damage in her left leg, resulting in weakness, numbness, tingling, burning and stabbing pain, a "foot drop," and a loss of feeling in her foot and toes [Hoskins Dep. pt. 1, p. 11, 15-16]. Ms. Hoskins completed her rehabilitation and physical therapy at the Rehabilitation Hospital of Indiana under the care of Dr. Lipson. *Id.* at 24. She regained the ability to walk during her physical therapy, but to date still requires the assistance of a walker and a brace on her left leg [Hoskins Dep. pt. 1, p. 15-16; as continued at DE 56-3, pt. 2, p. 11]. Ms. Hoskins admitted that the May 2005 accident resulted in a dramatic change in her lifestyle, including the inability to work in any capacity since the accident. *Id.* at 3, 14, 20. In fact, at one time Ms. Hoskins believed that she would never be able to walk again. *Id.* at 15, 22.

After Ms. Hoskins was released from the hospital and rehabilitation in June 2005, she continued to receive treatment from Drs. Hafeez and Ramos [Hoskins Dep. pt. 1, p. 7]. Ms. Hoskins saw Dr. Hafeez on July 1, 2005, who noted a drastic change in Ms. Hoskins' medication [Hafeez Dep., p. 6]. Ms. Hoskins was now taking Cymbalta and Trazodone, in addition to Zoloft, likely for depression and neuropathy pain. *Id.*

Three weeks later, on July 21, Ms. Hoskins saw Dr. Ramos for the first time since the May automobile accident [Ramos Dep., p. 7]. She was having trouble sleeping, rated her pain as a nine, and reported that the pain radiated down her buttocks, thighs, legs, and feet. *Id.* She also experienced weakness and a decreased sensation in her lower left extremity and had to walk with

a cane. *Id*. at 7-8. Dr. Ramos performed a straight leg test which identified pain in Ms. Hoskins'

left leg and right thigh. *Id*. at 8. Although Ms. Hoskins did not recall being advised to see a

mental healthcare provider at any time before December 2005, *see* [Hoskins Dep. pt. 1, p. 4], Dr.

Ramos testified that he again advised Ms. Hoskins to seek psychiatric or psychological help,

doubled her prescription for Methadone, and switched her from Hydrocodone to Morphine

Sulfate Immediate Release ("MSIR") because her condition was worsening and the pain was not

being adequately managed [Ramos Dep., p. 9; Hafeez Dep., p. 7].

The following week Ms. Hoskins saw a nurse practitioner in Dr. Hafeez's office and

complained of tingling and pain in both feet and rated her pain as a six [Hafeez Dep., p. 7-8].

Dr. Hafeez noted that Ms. Hoskins had been placed on additional pain medication, which he felt

was consistent with her condition worsening [Hafeez Dep., p. 7]. However, Ms. Hoskins was

advised to follow-up with Dr. Ramos since she was seeing him for her pain treatment prior to the

May 2005 accident [Hoskins Dep. pt. 1, p. 24].

On August 16, Dr. Ramos documented treating Ms. Hoskins for the following: "chronic

pain, mid back pain, and the back pain after the burst fracture surgery. Low back pain and mid

back pain. Still the low back pain that radiates down to the left leg. And weakness of the left leg

and the left foot" [Ramos Dep., p. 9]. She further presented complaints of pain in her right thigh.

*Id*. As Ms. Hoskins' problems seemed unchanged, Dr. Ramos continued her on the same

medications (as increased after the May accident). *Id*.

Less than 2 weeks before Ms. Hoskins' December 2005 automobile accident, Ms.

Hoskins again sought treatment from both Drs. Ramos and Hafeez. On November 22, Ms.

Hoskins rated her level of pain as a six and still complained of "the same pain" [Ramos Dep., p.

9-10]. Dr. Ramos prescribed the same pain medication as prescribed on July 21, except to add a prescription for Lyrica to help with the stabbing, burning pain that was not effectively managed by the Cymbalta. *Id*. at 10. Dr. Ramos continued to recommend that Ms. Hoskins have a regular exercise routine and seek psychological support. *Id*.

On November 30, Ms. Hoskins reported having a disability exam for disability benefits with another office, and reported high levels of stress, sleeplessness, depression, anxiety, and "chronic back pain post motor vehicle accident" [Hoskins Dep. pt. 1, p. 14; Hafeez Dep., p. 8-9]. Dr. Hafeez indicated that Ms. Hoskins' pain medicine, Methadone, had increased since her July visit, and he assumed this was consistent with her pain worsening. *Id*. at 8. Ms. Hoskins was advised to continue taking Cymbalta but not Zoloft (so she would not be combining two different antidepressants), and she was prescribed Trazodone for her sleeplessness and Xanax for her anxiety [Hoskins Dep. pt. 1, p. 25; Hafeez Dep., p. 8-9].

Despite the fact that immediately before the December 2005 accident Ms. Hoskins' medical records documented her continued chronic pain and prescriptions/treatment for the same, Ms. Hoskins testified during her deposition that she was weaning off of the pain medicine or was not taking it a all [Hoskins Dep. pt. 1, p. 7, 9, 22; Ramos Dep., p. 17]. As to her lower back pain, Ms. Hoskins testified that similar to her pain resulting from the 2002 accident, she did not experience "lower back" pain after the May 2005 accident [Hoskins Dep. pt. 1, p. 18, 23; pt. 2, p. 2]. Yet Ms. Hoskins' testimony contradicts Dr. Ramos' testimony and records, as detailed [Ramos Dep., p. 15, 17; Hafeez Dep., p. 8]. Ms. Hoskins also sought disability benefits in November 2005, yet she testified that before having the December 2005 accident, she planned to go back to work in January 2006 because she felt like she was at a level where she could do so

[Hoskins Dep. pt. 2, p. 12].

December 2005 Automobile Accident

On December 4, 2005, Ms. Hoskins had a second automobile accident during which a semi-truck driven by an employee of the Defendant struck the rear part of Ms. Hoskins' minivan [Hoskins Dep. pt. 2, p. 4-5]. Ms. Hoskins was taken to the Emergency Room at St. Vincent Hospital where she was experiencing spasms and severe back pain, and was afraid to move for fear that she would aggravate her prior back surgery [Hoskins Dep. pt. 1, p. 6; pt. 2, p. 9; Hafeez Dep., p. 11, 13]. When Dr. Hafeez saw Ms. Hoskins in the hospital the following day, he started her on a morphine pump due to her increased pain, placed her on muscle relaxers for her spasms, and recorded her complaints which consisted of "the very same areas of her body that were injured before the accident" [Hafeez Dep., p. 10, 13-14]. Throughout her hospital stay, Ms. Hoskins did not complain of any pain or discomfort in her right leg. *Id*. at 11-12. Upon discharging Ms. Hoskins on December 7, Dr. Hafeez examined her and noted that there appeared to be no numbness in either of her legs and no weakness in her extremities (or any neurological or muscular deficiency). *Id*. at 11.

On January 3, 2006, Dr. Ramos treated Ms. Hoskins for the first time since her December 2005 accident [Ramos Dep., p. 11]. Similar to her November 22 appointment with Dr. Ramos, Ms. Hoskins rated her pain as a six, was taking the same dose of Methadone and MSIR, and was still experiencing difficulty sleeping. *Id*. She continued to complain of left leg pain, but also presented for the first time, a complaint about tingling in her right leg (as opposed to just her right thigh) [Ramos Dep., p. 11, 16, 18]. Although Dr. Ramos documented Ms. Hoskins' subjective complaints of right leg pain, he did not find any objective evidence of pain upon

examination. *Id.* at 11. Dr. Ramos "continued to recommend the same treatment, the same recommendation with regards to the medication, weight loss program, and seeing a psychologist for psychological coping skills to manage her chronic pain, [and] exercise program to strengthen her lower extremities" [Ramos. Dep., p. 11-12].

On January 13, Ms. Hoskins reported numbness and tingling in her right leg for the first time to Dr. Hafeez [Hafeez Dep., p. 13]. Ms. Hoskins specifically stated that there was numbness and throbbing pain in her right leg from the knee down, and tingling in her toes [Hoskins Dep. pt. 2, p. 1]. On February 23, Ms. Hoskins still complained of pain, numbness, and weakness in her right lower extremity to Dr. Hafeez [Kusumi Rpt., p. 3]. However, Dr. Hafeez did not actually follow-up with and treat Ms. Hoskins for any complaints as to her right leg, or any other pain-related conditions, and he never changed her pain medication, because he knew that Ms. Hoskins had a specialist treating those concerns [Hafeez Dep., p. 14, 15]. Ms. Hoskins agreed that she saw Dr. Hafeez only for general checkups [Hoskins Dep. pt. 2, p. 10].

On March 2, Ms. Hoskins had a follow-up visit with Dr. Ramos during which she did not complain of any pain in her right leg or foot, but she only complained of pain in her left leg, left foot, and lower back [Ramos Dep., p. 12]. Dr. Ramos confirmed that Ms. Hoskins' complaints, were the same complaints that she made prior to the December 2005 accident. *Id.* He further noted that her medications were the same as before the December 2005 accident, except it appeared that a psychiatrist had placed her on Zoloft, and she was back on Cymbalta instead of Lyrica [Hoskins Dep. pt. 1, p. 4; Ramos Dep., p. 12]. Ms. Hoskins continued to report difficulty sleeping (similar to the reports she made prior to the December 2005 accident). *Id.*

Ms. Hoskins returned to see Dr. Mobasser on June 14, 2006 due to pain and numbness in

her right extremity [Kusumi Rpt., p. 3]. Dr. Mobasser noted that Ms. Hoskins continued to improve since her May 13, 2005 surgery, but now she returned with complaints of pain and numbness in her distal right extremity. *Id*. Because Dr. Mobasser did not know the cause of her symptoms, he referred Ms. Hoskins to a neurologist, Dr. Semersheim. *Id*.

Before seeking Dr. Semersheim's opinion, on June 22 and July 20, Ms. Hoskins went to Dr. Ramos and complained of left leg pain and numbness in the left foot [Ramos Dep., p. 13]. Dr. Ramos documented that her prescription for Cymbalta had been increased since April. *Id*. at 13-14. He testified that Ms. Hoskins did not complain of any right leg pain (except as to a decreased sensation in her right thigh), and that his examination revealed no right leg pain. *Id*.

In September 2006, Ms. Hoskins was on the same medication as before the December 2005 accident and she complained more about her left leg than her right leg. *Id*. at 14, 18. In fact, Dr. Ramos testified that from July 2005 until March 2008, he treated Ms. Hoskins every one to three months for low and mid back pain that radiated to her left foot, but not for significant right leg complaints [Ramos Dep., 14-15, 18].

However, on September 27, 2006, Ms. Hoskins had an MRI performed by Dr. Semersheim of JWM Neurology, who diagnosed Ms. Hoskins' lower right extremity numbness as being consistent with a "peripheral neuropathy in the peroneal and posterior tibial nerve" [Kusumi Rpt., p. 3]. In March 2007, Ms. Hoskins still complained of persistent pain in both legs to Dr. Ramos [Kusumi Rpt., p. 3], and complained of right leg pain to Dr. Hafeez on August 30, and to Dr. Zanetas in September. *Id*. On September 6, 2007, Ms. Hoskins had an EMG performed by Dr. Mobasser, who opined that Ms. Hoskins suffered from neuropathy of the peroneal posterior tibial nerve [DE 56-6, Kusumi Dep., p. 7]. Ms. Hoskins then filed this lawsuit

on November 20, 2007, and continued to be treated for pain by Dr. Ramos until April 9, 2008.

*Id*.

Dr. Kusumi's Treatment and Review

In April 2008, over two years after Ms. Hoskins' second automobile accident, Dr. Kusumi[3] took the place of Dr. Ramos and began treating Ms. Hoskins for her pain [Hoskins Dep. pt. 2, p. 10; Kusumi Dep., p. 2]. Since Drs. Ramos and Kusumi were in the same medical group, Dr. Kusumi reviewed Ms. Hoskins' file from Dr. Ramos [Kusumi Dep., p. 2-3]. Because Dr. Ramos had already "worked-up" Ms. Hoskins' existing pain, Dr. Kusumi did not do so, but she personally determined the cause of Ms. Hoskins' pain before prescribing her medication. *Id*. at 3-5. Dr. Kusumi also reiterated to Ms. Hoskins that she needed to lose weight because it would, and actually did, help decrease Ms. Hoskins' depression. *Id*. at 6.

Throughout treatment with Dr. Kusumi, Ms. Hoskins repeatedly complained of pain in her lower back and right leg [Hoskins Dep. pt. 1, p. 23; Kusumi Rpt., p. 4]. Ms. Hoskins reported that she could not trust her right leg for support, and that she fell several times [Hoskins Dep. pt. 2, p. 1]. Because Ms. Hoskins' major complaint to Dr. Kusumi was her right "long toe," Dr. Kusumi tried to determine the cause of the problem [Kusumi Dep., p. 8]. To do so, Dr. Kusumi reviewed Ms. Hoskins' emergency room records from her 2002 tubing accident and Dr.

---

[3]Dr. Kusumi became a medical doctor in 2007, is board certified in anesthesia and pain management, and has completed a pain management fellowship [Kusumi Dep., p. 3, 9, 14-15]. Generally, after a patient experiences pain for over a month, a primary care physician refers the patient to Dr. Kusumi. *Id*. at 3. If not already completed, Dr. Kusumi would "work-up" a patient's pain to figure out the cause of the symptom, which oftentimes requires Dr. Kusumi to order and interpret a lumbar MRI or an EMG. *Id*. at 3-5. After determining the source of the pain, Dr. Kusumi will administer treatment to relieve it. *Id*. at 3. However, Dr. Kusumi never gives patients pain medication unless she personally knows why the patient is having the pain based on her interpretation of tests conducted by herself or other specialists [Kusumi Dep., p. 5].

Ramos' subsequent treatment records [Kusumi Rpt., p. 1]. Dr. Kusumi also reviewed Ms. Hoskins' emergency room records from her May 2005 automobile accident, Dr. Mobasser's burst-fracture surgery, and Dr. Lipson's rehabilitation follow-up. *Id*. at 2.

Dr. Kusumi found it significant that Ms. Hoskins' June 2005 RHI records documented numbness and tingling in both of Ms. Hoskins' legs; however, by August 2005 her pinprick test (to detect pain) in the right lower extremity was normal, and in October 2005 the strength of her right long toe muscle (known as the flexor hallucis longus, as supplied by the L5 nerve root) was also normal [Kusumi Dep., p. 7-9; Kusumi Rpt., 2]. As such, Dr. Kusumi testified that prior to December 2005 she did not see any abnormality as to Ms. Hoskins' right leg [Kusumi Dep., p. 7, 9, 16]. Further, Dr. Kusumi believed that just prior to December 2005 Ms. Hoskins was improving because she no longer complained of the pain in her buttocks, thighs, legs and feet, as she did after the May 2005 accident; and instead, she only reported suffering pain in the left leg and right thigh, with weakness in the lower left extremity [Kusumi Rpt., p. 2, 4].

Dr. Kusumi also reviewed Ms. Hoskins' medical records post-December 2005. Dr. Kusumi noted that while Ms. Hoskins complained of increased back pain in the emergency room, she had no weakness or numbness in her lower extremities. *Id*. Yet, in January 2006, Dr. Ramos reported Ms. Hoskins' new symptom of right leg and foot tingling and pain, of which Ms. Hoskins again reported in February, July, and August [Kusumi Rpt., p. 3].

After Dr. Mobasser referred Ms. Hoskins' complaint of right leg pain and numbness to Dr. Semersheim in June, Dr. Kusumi thought it significant that Dr. Semersheim's MRI interpretation from September 27, 2006, and Dr. Mobasser's EMG conducted on September 6, 2007, revealed that Ms. Hoskins' lower extremity numbness was consistent with peripheral

neuropathy—meaning that Ms. Hoskins would experience numbness in the area because the nerve outside the spinal cord is not functioning properly [Hoskins Dep. pt. 2, p. 1-2; Kusumi Dep., p. 7, 9, 19, 24; Kusumi Rpt., p. 3]. Although Dr. Kusumi realized that the straight leg test conducted by Dr. Ramos in November 2005 revealed pain in both legs, she believed that the EMG was more specific at determining whether or not the pain was from a spinal source or from a peripheral source [Kusumi Dep., p. 24-25]. Thus, Dr. Kusumi relied heavily on the EMG in formulating her opinion that the December 2005 accident caused neuropathy in her peroneal and posterior tibial nerves in Ms. Hoskins' right leg [Kusumi Dep., p. 24-25; Kusumi Rpt., p. 4]. Furthermore, Dr. Kusumi testified that increased medications alone cannot predict whether Ms. Hoskins' condition was getting worse before the December accident because oftentimes pain medications are increased as a result of increased tolerance [Kusumi Dep., p. 22].

For purposes of drafting her expert report and drawing conclusions in this case [DE 56-7], Dr. Kusumi reviewed Dr. Ramos' deposition taken in reference to this case, but she did not review Ms. Hoskins' disability exam records, Dr. Hafeez's medical records from July 1 and July 28, 2005, or the depositions of Ms. Hoskins or Dr. Hafeez taken in reference to this case [Kusumi Dep., p. 9-13, 17, 19, 26; Kusumi Rpt., p. 1]. Dr. Kusumi's experience in pain management, review of the identified documents, and treatment of Ms. Hoskins' pain, led her to conclude that Ms. Hoskins experienced an exacerbation of her pre-existing injuries (as to her lower back, left leg pain, and depression) and new problems with her right leg [Kusumi Dep. 24, 28, 30]. Dr. Kusumi gave less weight to the opinion of Defendants' expert, Dr. Neil H. Levin, because he never treated Ms. Hoskins and only examined her one time [Kusumi Dep., p. 17-18].

After drafting her report, Dr. Kusumi had the opportunity to review Dr. Hafeez's July 1

and July 28 medical records and a portion of Dr. Hafeez's deposition (pages 38 to 42) which detail his treatment of Ms. Hoskins immediately after the December 2005 accident [Kusumi Dep., p. 21-22, 26-27, 31]. Dr. Kusumi confirmed that after reviewing the same, she is still confident in her reliance on the EMG results and the basis of her expert opinion and report. *Id*. Dr. Kusumi believed that as to Ms. Hoskins' right leg, "her neurologic tests would not have been normal in the October examination had she had the issue— had she not had something happen between October and the date of the EMG" [Kusumi Dep., p. 27].

Based on the facts of this case, the Court now considers whether Dr. Kusumi's expert testimony as to the causation of Ms. Hoskins' pain is admissible based on the standards set forth in Rule 702 of the Federal Rules of Evidence and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

### III. DISCUSSION

Expert testimony is admissible in a court of law as set forth by Rule 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. *Daubert* laid the foundation for this rule establishing the district court's role as a "gatekeeper," required to weigh the reliability and relevance of the proffered evidence. *Daubert*, 509 U.S. at 589; *United States v. Parra,* 402 F.3d 752, 758 (7th Cir. 2005) (Rule 702 has superseded the decision in *Daubert,* but the standard of review established for *Daubert* challenges remains appropriate). In fulfilling its role as gatekeeper, the Court must consider

whether (1) the expert will be testifying to scientific knowledge that is valid, and (2) whether that testimony will, in fact, aid the trier of fact in the understanding of or in determining a fact in issue. *Daubert,* 509 U.S. at 592; *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000). Furthermore, inquiry as to relevance and reliability must be made in all matters that relate to expert testimony and not just those containing scientific testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).

The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard. *Lewis v. CITGO Petroleum Corp*., 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed.R.Evid. 702 advisory committee's note (2000 Amends.) ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."); *cf. Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987) (holding that the proponent of hearsay evidence must prove to the court, by a preponderance of the evidence, that the Rules of Evidence have been satisfied)). Thus, Plaintiffs bear the burden of demonstrating that Dr. Kusumi's testimony satisfies the *Daubert* standard. Defendants argue that any opinion offered by Dr. Kusumi as to the causation, prognosis, and permanency of Ms. Hoskins' injuries should be excluded because her opinion is not reliable and is not relevant.

A. **RELIABILITY**

To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive at a particular conclusion. *United States v. Pansier,* 576 F.3d 726, 737 (7th Cir. 2009) (citing *Ford Motor Co.*, 215 F.3d at

14

718).  Although the Seventh Circuit gives the district court "great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable," the district court "must provide more than just conclusory statements of admissibility to show that it adequately performed the *Daubert* analysis." *Pansier*, 576 F.3d at 737 (internal citations omitted).

Defendants suggest that Dr. Kusumi's opinion is unreliable because her qualifications are lacking (in that, she never before acted as an expert witness in a lawsuit, she only recently became a medical doctor, and she is not a neurologist, orthopedic surgeon, or psychologist), and because the records upon which she based her opinion are deficient thereby rendering her methodology unscientific.

Qualifications

An expert may be qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. *See Metavante Corp. v. Emigrant Sav. Bank,* 2010 WL 3385961 *8 (7th Cir. Aug. 30, 2010); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 176-77 (5th Cir. 1990), abrogated on other grounds by *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.14 (5th Cir. 1994).  The Seventh Circuit has explained that "'extensive academic and practical expertise' in an area is certainly sufficient to qualify a potential witness as an expert." *Ford Motor Co.*, 215 F.3d at 718 (citing *Bryant v. City of Chi.*, 200 F.3d 1092, 1098 (7th Cir. 2000) (stating that "[t]he *Daubert* inquiry is 'a flexible one' and is not designed to serve as a 'definitive checklist or test,' *Daubert*, 509 U.S. at 593-94, but rather to ensure 'that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'") (quoting

*Kumho Tire*, 526 U.S. at 152)). Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area. *Ford Motor Co.*, 215 F.3d at 718.

As to Dr. Kusumi's requisite knowledge, skill, experience, training, and education, the record reveals that from 2003 to 2006, Dr. Kusumi completed her residency at Indiana University, Department of Anesthesia, in general anesthesia and acute and chronic pain management. From 2006 to 2007, Dr. Kusumi underwent training in an accredited fellowship for pain management. Her fellowship entailed acute chronic cancer pain management, pediatric pain management, and conducting several pain blocks and multiple surgeries which included placement of intrathecal pain pumps and spinal cord stimulators. She was board certified in 2007 for anesthesia and pain management, and became a private practitioner in pain management. As a pain specialist, Dr. Kusumi receives patients by way of referrals from primary care physicians, and her job is to determine the cause of the patient's pain and treat it, whether by running her own diagnostic tests or interpreting tests conducted by other specialists. Aside from inheriting Dr. Ramos' work-up of Ms. Hoskins' pain, Dr. Kusumi diagnosed and treated Ms. Hoskins' pain similar to the way she cared for her other patients in her practice.

Although Dr. Kusumi's full range of hands-on experience may be limited, and she was not yet practicing at the time of Ms. Hoskins' December 2005 accident, Dr. Kusumi has treated patients for pain since 2007, and she personally treated and managed Ms. Hoskins' pain-related complaints since April 2008. Dr. Kusumi has performed advanced pain relief techniques, including the managed use of strong pain medications and surgical intervention. Dr. Kusumi is also a medical doctor, with specialized training in pain management.

Considering the nature of Dr. Kusumi's brief practical experience and treatment of Ms. Hoskins, along with her academic accomplishments and suitable specialized training, Dr. Kusumi has the requisite level of specialized knowledge, skill, experience, training, and education to render her qualified to give an opinion as to Ms. Hoskins' pain. Her experience, albeit somewhat limited, is not dispositive as to the outcome of the Rule 702 analysis. *See Kumho Tire*, 526 U.S. at 141. Clearly, Dr. Kusumi's opinion is not based simply on subjective beliefs or speculations; instead, as further detailed below, she has explained the methodologies and principles that support her opinion. Accordingly, the Court finds that her report is founded on the level of specialized knowledge, skill, experience, training, and education that meets the first prong of the two-part test under Rule 702.

Likewise, the Defendants' contention that Dr. Kusumi does not qualify as an expert because she has admittedly never acted as an expert witness in any other lawsuit, is without merit. This argument places the bar too high—no doctor would ever qualify to give medical expert testimony if the courts employed the rationale that a first-time expert cannot be an expert. More importantly, no such requirement exists in Rule 702.

Defendants further question the reliability of Dr. Kusumi's opinion because she is not a neurologist, an orthopedic surgeon, or some other specialist that they deem relevant. In other words, Defendants argue that Dr. Kusumi's qualification as a medical doctor is insufficient for her to provide reliable testimony concerning the causation and prognosis of Ms. Hoskins' back pain, leg pain, and resulting depression.

It is true that the Seventh Circuit has limited the subject matter on which an expert may provide testimony. *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (stating that "simply

17

because a doctor has a medical degree does not make [her] qualified to opine on all medical subjects.") (citation omitted).  Yet, courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats. *Id.*  Therefore, the correct inquiry is whether one's "qualifications provide a foundation for [the expert] to answer a specific question." *Id.*  So, the fact that Dr. Kusumi is not a neurologist, orthopedic surgeon, or psychologist does not automatically prevent her from testifying about the cause and prognosis of Ms. Hoskins' pain and depression; instead, the Court looks to her conclusions to see if she has the adequate knowledge, skill, experience, training, and education to reach them.

Turning to her conclusions, Dr. Kusumi opines that as a result of the December 2005 automobile accident, Ms. Hoskins experienced an exacerbation of her pre-existing injuries as to her lower back pain, left leg pain, and depression, and experienced a new problem or neuropathy in the nerves of her right leg.  Defendants argue that Dr. Kusumi is not qualified to assert any opinion as to Ms. Hoskins' depression, or to suggest the cause of her pain by interpreting tests that she did not perform, specifically an MRI and EMG which were performed by neurologists.

The Court disagrees.  First, Dr. Kusumi testified that she is a medical doctor and certified pain specialist, who, in order to determine the cause of a patient's pain, regularly performs patient examinations, reviews medical records leading up to her referral, considers a patient's subjective remarks, and oftentimes interprets old medical tests or new tests that she must order, including MRIs and EMGs. *See e.g. Diagnosis and Treatment of Low Back Pain: A Joint Clinical Practice Guideline from the American College of Physicians and the American Pain Society, Annals of Internal Medicine*, 2 October 2007, Vol. 147, Issue 7, 478-91, http://www.annals.org/content/147/7/478.full (last visited Sept. 12, 2010) (recommending that

clinicians should conduct a focused history, including an assessment of psychosocial risk factors, and conduct a physical examination; should perform diagnostic imaging and testing for patients with low back pain when severe or progressive neurologic deficits are present or when serious underlying conditions are suspected on the basis of history and physical examination; and should evaluate patients with persistent low back pain and signs or symptoms of radiculopathy or spinal stenosis with magnetic resonance imaging or computed tomography only if they are potential candidates for surgery or epidural steroid injection).  In this case, Dr. Kusumi determined the cause of Ms. Hoskins' pain in the manner she was trained to do—by personally reviewing and evaluating Ms. Hoskins' medical records, and by personally examining, listening to, and treating Ms. Hoskins' pain and evaluating her response to treatment.  This clinical methodology is acceptable. *See Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825 (7th Cir. 2010) (observing that physicians rely on treatises, medical tests, and laboratory findings to reach their causation conclusions); *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020 (7th Cir. 2000) (agreeing that in clinical medicine, the methodology of physical examination and self-reported medical history employed by a physician is generally appropriate); *Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999) ("either 'hands-on testing' or 'review of experimental, statistical, or other scientific data generated by others in the field' suffice as reasonable methodology") (citation omitted).

Although medical records indicated that both Drs. Semersheim and Mobasser detected neuropathy in Ms. Hoskins' right lower leg after the December 2005 accident, Dr. Kusumi testified that she independently found it significant that Ms. Hoskins' August and October 2005 medical records detected no abnormalities in her right lower extremity, whereas post-December

2005 tests revealed the new problem (which Ms. Hoskins complained about to Drs. Ramos, Hafeez, Kusumi, Semersheim and Mobasser). *See Clark*, 192 F.3d at 758. While Dr. Kusumi cannot merely be a mouthpiece for other specialists, *see Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002), she did not act as such because Dr. Kusumi interpreted Ms. Hoskins' test results herself, determined the cause of her pain, and only then prescribed pain medication, as she does with "100 percent" of her patients. It could be that a neurologist would have more experience in interpreting EMGs, but there is no question that Dr. Kusumi has sufficient expertise and capability to evaluate the contributions of the doctors upon which she relies. *See Happel*, 602 F.3d at 825.

As to Ms. Hoskins' increased depression, both Drs. Kusumi and Ramos confirmed that patients suffering from chronic pain typically experience resulting depression. Patients showing depressive symptoms are told to make certain lifestyle changes, including recommendations to lose weight, exercise, and seek mental health treatment. In fact, both Drs. Kusumi and Ramos noted that Ms. Hoskins experienced such depression at times and suggested that she lose weight and go to counseling. Therefore, as a regular part of administering pain managing treatment to her patients, Dr. Kusumi is certainly qualified to report whether Ms. Hoskins' depressive symptoms increased when her level of pain increased as a result of the December 2005 accident. Essentially, Dr. Kusumi's opinion about the cause of Ms. Hoskins' pain and depression were based on knowledge that any competent physician would possess, and on her specialized training using the diagnostic tools necessary for determining the source and cause of pain.

The Court finds that Dr. Kusumi's knowledge, skill, experience, education, and specialized training in diagnosing and treating pain, as well as her reliance on objective medical

test results and hands-on treatment of Ms. Hoskins, provide an adequate foundation in science for her to answer whether Ms. Hoskins' resulting pain and depression were exacerbated or caused by the December 2005 accident.

Sufficient Facts

The Defendants next assert that Dr. Kusumi did not base her opinions on sufficient facts, thus making her methodology unscientific and her opinion unreliable.  It is undisputed that before drafting her report, Dr. Kusumi did not read the depositions of Ms. Hoskins or Dr. Hafeez and did not review hospital records from Dr. Hafeez documenting his treatment of Ms. Hoskins immediately following her December 2005 accident.  Defendants also argue that Dr. Kusumi improperly discounted Dr. Ramos' November 2005 examination of Ms. Hoskins and the opinion of Dr. Levine, Defendants' independent medical examiner.

Neither *Daubert* nor the Federal Rules of Evidence requires an expert to review all of the facts, only a "sufficient" amount is required. *See* Fed.R.Evid. 702(1) advisory committee's note (2000 Amends.) (calling for a quantitative rather than a qualitative analysis).  The question is whether the expert considered enough information to make the proffered opinion reliable. *See* Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6266, at 41 (Supp. 2004).  An "expert's work is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (citation omitted).

Dr. Kusumi did not need to read Ms. Hoskins' deposition to know her history of pain and treatment.  Dr. Kusumi received that information by reviewing Ms. Hoskins' medical records and by personally treating Ms. Hoskins. *See Cooper,* 211 F.3d at 1019-21 (medical professionals

reasonably may be expected to rely on self-reported patient histories in their diagnostic work, even if found to be inaccurate, because the inaccuracies in the history are to be explored through cross-examination).  Nor was it necessary for Dr. Kusumi to review Dr. Hafeez's records and deposition because Dr. Hafeez did not regularly treat Ms. Hoskins for the conditions relevant to this case.  Dr. Hafeez only saw Ms. Hoskins for general check-ups.  While Dr. Hafeez may have noted complaints of pain after Ms. Hoskins' accidents and testified that she experienced worse pain immediately after the December 2005 accident, he never followed-up on her complaints of pain and never changed her pain medication throughout her pain management treatment. Moreover, Dr. Hafeez explicitly deferred to Ms. Hoskins' pain specialists, Drs. Ramos and Kusumi, for any testimony regarding injury and pain in Ms. Hoskins' legs or back because he did not treat those conditions.

Importantly, Dr. Kusumi *did* review Dr. Ramos' records and deposition, since it was Dr. Ramos who treated Ms. Hoskins' pain continually since the 2002 boating accident.  Dr. Kusumi also reviewed Ms. Hoskins' emergency room and rehabilitation records from both of the automobile accidents.  After drafting her report, Dr. Kusumi reviewed other records during her deposition at the direction of the Defendants.  After her review of the additional records, Dr. Kusumi maintained her position that Ms. Hoskins suffered new injury and an exacerbation of old injuries in the December 2005 accident.  Clearly, Dr. Kusumi considered sufficient relevant records to make her proffered opinion reliable.

Defendants' separate contention that Dr. Kusumi placed too little weight on other doctors' tests and opinions is also unpersuasive.  Dr. Kusumi did not baldly discount these items simply because they contradicted her opinion.  Rather, Dr. Kusumi explained that she gave Dr.

Levine's opinion little weight, because Dr. Levine never treated Ms. Hoskins, reviewed her medical history by way of records only, and examined her one time for purposes of the litigation. *See e.g. Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (one of the significant factors to be considered in determining reliability is whether the expert proposed to testify about matters growing naturally out of research conducted independent of the litigation or whether the expert developed the opinion expressly for purposes of testifying).  Dr. Kusumi explained that Ms. Hoskins' medical tests from pre-December 2005 revealed that Ms. Hoskins' right leg was neurologically intact and improving, indicating that the etiology of her pain is neuropathic, and not spinal as Dr. Levine believes.  Likewise, Dr. Kusumi disregarded the straight leg test performed by Dr. Ramos because she reasoned that the EMG would be more accurate in determining the source of the pain since it is an objective neurologic test. The fact that Defendants do not share Dr. Kusumi's views do not bring the reliability of her methods into question. *See Cooper*, 211 F.3d at 1021 (determining that the possibility of the plaintiff's chronic pain syndrome being attributable to another factor other than the incident which is the subject of the lawsuit is a matter quite susceptible to exploration on cross-examination by opposing counsel); *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000) (noting that two different experts may reach opposing conclusions from the same information); *see also* Fed.R.Evid. 702(1) advisory committee's note (2000 Amends.) (the reliability of one expert's testimony does not necessarily mean that contradictory expert testimony is unreliable).

Ultimately, "[t]he question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the [trier-of-fact] to determine after opposing counsel has been provided the opportunity to cross-examine

the expert regarding h[er] conclusions and the facts on which they are based." *Ford Motor Co.*,
215 F.3d at 719 (citing *Walker*, 208 F.3d at 589-90). This Court does not decide whether the
expert's opinion is correct but is instead "limited to determining whether expert testimony is
pertinent to an issue in the case and whether the methodology underlying that testimony is
sound." *Id.* (citation omitted). "Vigorous cross-examination, presentation of contrary evidence,
and careful instruction on the burden of proof are the traditional and appropriate means of
attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *Metavante Corp. v.
Emigrant Sav. Bank*, 2010 WL 3385961 *8 (7th Cir. Aug. 30, 2010) (the "[d]etermination on
admissibility should not supplant the adversarial process; shaky expert testimony may be
admissible, assailable by its opponents through cross-examination.") (quoting *Gayton*, 593 F.3d
at 616).

It is true that Dr. Kusumi did not consider every document available in this case before
drafting her report, did not retain her handwritten notes after drafting her report, and did not
assign the same weight to every record she discussed in the report. However, the Court is
satisfied that based on the record, including Dr. Kusumi's report and explanations, she will
testify with the same level of intellectual rigor that characterizes her practice outside the
courtroom. *Kumho Tire*, 526 U.S. at 152. Thus, the Court finds Dr. Kusumi's testimony to be
reliable and admissible on these grounds.

## B. RELEVANCY

Even if an expert's testimony is deemed reliable, it must be excluded if it is not relevant.
Relevancy means that the testimony is likely "to assist the trier of fact to understand the evidence
or determine a fact in issue." *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996); *see Ford*

*Motor Co.*, 215 F.3d at 721 ("in order for an expert's testimony to qualify as 'relevant' under Rule 702 it must assist the jury in determining *any* fact at issue in the case"). Stated another way, "the suggested . . . testimony must 'fit' the issue to which the expert is testifying." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (quoting *Porter v. Whitehall Labs. Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)). The Seventh Circuit requires the court to evaluate "the state of knowledge presently existing about the subject of the proposed testimony in light of its appraisal of the facts of the case." *United States v. Brown*, 7 F.3d 648, 652 (7th Cir. 1993). However, "[i]t is not the trial court's role to decide whether an expert's opinion is correct," as the court "is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Ford Motor Co.*, 215 F.3d at 719 (citation omitted).

Defendants argue that Dr. Kusumi's opinion is not relevant because her opinion is inconsistent, unclear and will not assist the trier of fact in understanding or determining the issues at hand. However, the Defendants have also conceded that "establishing a causal connection between [Ms. Hoskins'] alleged injuries and the accident involving the defendant is a complicated medical question that is not within the common knowledge of a lay juror" [DE 56 at 4, ¶ 7].

In order to receive a damage award from the Defendants in this lawsuit, Ms. Hoskins must prove that her injuries were caused and/or exacerbated by the December 4, 2005 automobile accident. Ms. Hoskins' medical expert, Dr. Kusumi, proposes to testify as to the causation, prognosis, and permanency of those injuries that Ms. Hoskins sustained in the accident. Clearly, Dr. Kusumi's testimony relates to significant issues in dispute and is relevant

to one of the ultimate questions in this litigation, that is, whether Ms. Hoskins' injuries were a result of the Defendants' conduct.

Given that Ms. Hoskins was involved in three major accidents which caused her injury, determining whether Ms. Hoskins' injuries were caused or exacerbated by the collision with the Defendants is of such a complicated and specific nature that an expert is required to help the jury make a determination for themselves. *See Daub v. Daub*, 629 N.E.2d 873, 878 (Ind. Ct. App. 1994) (expert testimony is required to establish the specific cause of a back injury where the plaintiff has a history of back problems). Dr. Kusumi's proposed testimony lends itself to assisting the jury in understanding Ms. Hoskins' resulting injuries and recovery after each accident, and her future prognosis. Whether or not a jury will agree with Dr. Kusumi that Ms. Hoskins seemed to be getting better before the December 2005 accident, has yet to be seen. At any rate, her testimony will assist the jury in its determination of causation and damages. As such, Dr. Kusumi's opinions are sufficiently reliable and relevant to assist the jury in understanding the facts at issue here.

## IV. CONCLUSION

The grounds that Defendants raise for the exclusion of Dr. Kusumi's testimony are grounds for cross-examination, not wholesale disqualification of the witness. The Court finds that Dr. Kusumi is a qualified expert proposing to testify based on specialized knowledge, skill, experience, training, and education that will assist the trier of fact in understanding or determining a fact in issue. In addition, her opinion is based upon sufficient facts and data, and is a product of reliable principles and methods which she has applied reliably. Furthermore, the Court does not find that the probative value of such testimony is substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury.  For the reasons

discussed, this Court concludes that Dr. Kusumi's testimony meets the standards set out in

*Daubert* and Rule 702 of the Federal Rules of Evidence and is therefore admissible.

Accordingly, Defendants' Motion to Bar is DENIED [DE 56].  The Court further extends

the dispositive motion deadline up to and including **Friday, November 12, 2010**.  As it appears

this ruling will affect Defendants' pending summary judgment motion [DE 67], Defendants are

granted leave to file an amended motion up to and including **Friday, November 12, 2010**.

SO ORDERED.

ENTERED: October 12, 2010

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court